**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| TERRIANN WALKER, individually, and on behalf of others similarly situated, | : | |
| | : | |
| Plaintiff, | : | CASE NO: |
| | : | |
| v. | : | |
| | : | |
| PEOPLE'S UNITED BANK and DOES 1 through 100, | : | |
| | : | |
| Defendants. | : | February 21, 2017 |

**CLASS ACTION COMPLAINT**

Plaintiff Terriann Walker ("Plaintiff"), by her attorneys, hereby brings this class and representative action against People's United Bank and DOES 1 through 100 (collectively "PUB" or "Defendant").

**NATURE OF THE ACTION**

1.      All allegations herein are based upon information and belief except those allegations which pertain to Plaintiff or her counsel.  Allegations pertaining to Plaintiff or her counsel are based upon, *inter alia*, Plaintiff or her counsel's personal knowledge, as well as Plaintiff or her counsel's own investigation.  Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

2.      This is a class and representative action brought by Plaintiff to assert claims in her own right, and in her capacity as the class representative of all others persons similarly situated. PUB wrongfully charged Plaintiff and the class members (defined below) overdraft fees.

3.      This class action seeks monetary damages, restitution, and injunctive relief due to PUB's policy and practice of assessing an overdraft fee on transactions when there was enough money in the checking account to cover (pay for) the transactions presented for payment.  The

charging for such overdraft fees breaches PUB's contracts with its customers, who include Plaintiff and the members of the Class.

4.      The charging for such overdraft fees also violates federal law.  Because PUB failed to describe its actual overdraft service in its Opt-In Contract by, inter alia, failing to describe accurately in its Opt-In Contract the actual method by which PUB calculates its overdraft fees, and because, alternatively, PUB did not obtain opt-ins from certain customers whatsoever, Regulation E (12 C.F.R. §§1005.17 *et seq*.) of the Electronic Fund Transfer Act (15 U.S.C.A. §§ 1693 *et seq*.) prohibited PUB from assessing overdraft fees for automated teller machine (ATM) and non-recurring debit card transactions (12 C.F.R. §1005.17(b)(1)(i)), but PUB did so anyway.

## PARTIES

5.      Plaintiff is a resident of Bridgeport, Connecticut, and was a customer of PUB at all times relevant to the class action allegations.

6.      Based on information and belief, Defendant PUB is and has been a federally chartered stock savings bank with its headquarters in Bridgeport, Connecticut, operating 10 branches in the state of Connecticut.  PUB is a "financial institution" within the meaning of Regulation E (12 C.F.R. § 1005.2(i)).

7.      Without limitation, defendants Does 1 through 100, include agents, partners, joint ventures, subsidiaries and/or affiliates of PUB and, upon information and belief, also own and/or operate PUB branch locations.   Each of defendants Does 1 through 100 is a "financial institution" within the meaning of Regulation E (12 C.F.R. § 1005.2(i)).  As used herein, where appropriate, the term "PUB" is also inclusive of defendants Does 1 through 100.

8.      Plaintiff is unaware of the true names of defendants Does 1 through 100. Defendants Does 1 through 100 are thus sued by fictitious names, and the pleadings will be amended as necessary to obtain relief against defendants Does 1 through 100 when the true names are ascertained, or as permitted by law or by the Court.

9.      There exists, and at all times herein mentioned existed, a unity of interest and ownership between the named defendants (including Does) such that any corporate individuality and separateness between the named defendants has ceased, and that the named defendants are alter egos in that the named defendants effectively operate as a single enterprise, or are mere instrumentalities of one another.

10.     At all material times herein, each defendant was the agent, servant, co-conspirator and/or employer of each of the remaining defendants, acted within the purpose, scope, and course of said agency, service, conspiracy and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining defendants, and ratified and approved the acts of the other defendants.  However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

11.     Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of Defendant's ordinary business and affairs.

12.     As to the conduct alleged herein, each act was authorized ratified or directed by Defendant's officers, directors, or managing agents.

## VENUE AND JURISDICTION

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant is a resident of this District, and pursuant to § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

**A.    PUB's Unlawful Charges of Overdraft Fees**

15.    PUB is a bank with over 10 branches in Connecticut and holds approximately $39.18 billion in assets.  PUB offers its consumer banking customers a checking account.  One of the features of a PUB checking account is a debit card, which can be used for a variety of transactions including the purchasing of goods and services.  In addition to receiving a debit card, other features of a PUB checking account include: the ability to write checks; withdraw money from ATMs; schedule Automated Clearing House (ACH) transactions (certain recurring payments); and, other types of transactions that debit from a checking account.

16.    In connection with its processing of debit transactions (debit card, ATM, check, ACH, and other similar transactions), PUB assesses overdraft fees to customer accounts when it determines that a customer's account has been overdrawn.

17.    Overdraft fees constitute the primary fee generators for banks and credit unions. For example, in 2009, banks generated an estimated $37 billion from overdraft fees on debit purchases and ATM transactions.

18.    The high cost of an overdraft fee is usually unfairly punitive.  In a 2012 study, more than 90% of customers who were assessed overdraft fees overdrew their account by mistake.  (May 2012 Pew Charitable Trust report entitled "Overdraft America:  Confusion and Concerns about Bank Practices", at p. 4, http://www.pewtrusts.org/~/media/legacy/uploadedfiles/pcs_assets/2012/sciboverdraft20america 1pdf.pdf).   More than 60% of the transactions that resulted in a large overdraft fee were for less than $50.  (June 2014 Pew Charitable Trust report entitled "Overdrawn", at p. 8).  More than 50% of those who were assessed overdraft fees do not recall opting into an overdraft program (*id.* at p. 5), and more than two-thirds of customers would have preferred the financial institution decline their transaction rather than paying the transaction into overdraft and charging a very large fee (*id.* at p. 10).

4

19.     Unfortunately, the customers who are assessed these fees are the most vulnerable customers.  Younger, lower-income, and non-white account holders are among those who were more likely to be assessed overdraft fees.  (*Id.* at p. 1).  A 25-year-old is 133% more likely to pay an overdraft penalty fee than a 65-year-old.  (*Id.* at p. 3).  More than 50% of the customers assessed overdraft fees earned under $40,000 per year.  (*Id.* at p. 4).  Non-whites are 83% more likely to pay an overdraft fee than whites.  (*Id.* at p. 3).

20.     As a result of banks taking advantage of millions of customers through the unfair practice of charging overdraft fees through methodologies that maximize the possible number of expensive overdraft fees to be charged, there has been a substantial amount of litigation over the past few years. The outcome of these cases has predominantly fallen in favor of plaintiffs with the banks repaying their customers over one billion dollars for the unlawfully assessed overdraft fees by way of jury verdicts and settlements.[1]

21.     The federal government has also stepped in to provide additional protections to customers with respect to abusive overdraft policies.  In 2010, the Federal Reserve Board enacted regulations giving financial institutions the authority to charge overdraft fees on ATM and one-time debit card transactions only if the institution first obtained the affirmative consent of the customer to do so. (12 C.F.R. § 1005.17 (Regulation E's "Opt-In Rule").)

22.     To qualify as affirmative consent, the Opt-In Contract must include, but is not limited, to the following:

> • The customer must be provided the overdraft policy, including the dollar amount of any fees that will be charged for an overdraft and the daily maximum number of fees that may be charged (if there is no maximum, that fact must be stated);

---

[1] http://files.consumerfinance.gov/f/documents/CFPB_Arbitration_Agreements_Notice_of_Proposed_ Rulemaking.pdf , at p. 74-75.

- If the institution offers other means for avoiding overdrafts, such as linking the account to a different account or a line of credit, then it must state that those options exist.
- The opt-in contract must be obtained separately from other contracts and acknowledgements;
- The contract cannot serve any purpose other than opting into the overdraft program;
- The consent cannot be a pre-selected checked box;
- The financial institution may not provide different terms for the account depending on whether the customer opted in to the overdraft program.

If the financial institution does not obtain proper, affirmative consent from the customer that meets all of the requirements of Regulation E's Opt-in Rule, then it is not permitted to charge overdraft fees on ATM and one-time debit card transactions.

23.     At all relevant times, PUB has had an overdraft program in place for assessing overdraft fees which is: (1) contrary to the express terms of its contract with customers; (2) contrary to PUB's representations about its overdraft program to its customers; and (3) contrary to its customers' expectations regarding the assessment of overdraft fees.

24.     PUB entered into a contract with Plaintiff and its other customers referred to herein as the "Opt-In Contract." PUB was required by Regulation E to provide a contract to Plaintiff and the class members which governs the terms under which PUB may assess Plaintiff and the Class members overdraft fees for ATM and non-recurring debit card transactions, and must obtain their affirmative agreement to the contract before being allowed to charge overdraft fees for these debit card and ATM transactions. On information and belief, the Opt-In Contract stated, "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway." This promise means that PUB is not authorized to assess an overdraft fee—because an overdraft has not occurred—unless there is not enough money in the customer's account to cover the transaction. This contract does not in any way state that there

6

will be deductions made from the money in the customer's account arising from holds placed on pending debit card transactions to create a different artificial balance other than the money in the account on which overdraft fees would be assessed, nor does it state holds placed on moneys in the account arising from deposit holds would lower the amount of money in the account for purposes of allowing an overdraft fee to be assessed. Furthermore, because the Opt-In Contract does not describe PUB's actual overdraft practice, the Opt-In Contract fails to comply with the requirements of Regulation E. The Opt-In Contract nonetheless contains promises to which PUB is contractually bound.

25. PUB entered into a second contract with Plaintiff and its other customers titled "Account Agreement." The Account Agreement contains a promise that PUB will not charge overdraft fees for any type of transaction where there is enough money in the account to pay for the transaction. The terms of the Account Agreement are reflected in the version of that document dated March 2016. It states in a section pertaining specifically to "Fees:" "An Overdraft Fee will be charged against your account if there are insufficient funds in your account to pay an Item drawn against your account." In another section, and in possible contradiction of this language, it states, "[a]n overdraft takes place on an account when an Item is presented for payment on the account and there are insufficient funds or insufficient available funds to pay the Item in full." These two sections are potentially in contradiction because, *inter alia*, upon information and belief, "funds in your account" is the official record of activity in the account; the balance used to determine interest on deposits and any minimum balance requirements; the balance used by PUB to report its deposits to regulators, shareholders and the public; the deposit balance provided to regulators in call reports and reserve reports; the balance used in financial reports to shareholders and the balance used for internal financial reporting; and, the balance used by credit reporting agencies in providing credit ratings of PUB. Therefore, "insufficient funds" does not contemplate any sorts of holds on the money in the account. In contrast, in possible contradiction of this in the other sentence, "insufficient available funds" might or might

not mean something else, creating a possible ambiguity in this second contract within its own terms.

26.     But what is undisputable is that nowhere in the Account Agreement in effect during the class period in this lawsuit does the contract anywhere state that for purposes of an overdraft fee that PUB would deduct from the funds in the account holds for pending debit card transactions, or that pending debit card transactions will be subtracted from the balance to create a lower artificial balance different than the real balance for purposes of assessing an overdraft fee. Nowhere does PUB state in the Account Agreement before November 2016, which is the Account Agreement pertaining to the class period, that there would be any effect on availability of funds or balance arising from placing holds on pending transactions—the very practice this case confronts. As described below, this only occurred for the first time with the November 2016 Account Agreement, one not applicable to this class period.

27.     PUB changed its Account Agreement in November 2016 to purport to change its contract terms as to when it would charge overdraft fees. Specifically, the new account agreement as of November 2016 now expressly stated that it would indeed place holds on pending debit card transactions and thereby reduce the balance available for purposes of assessing when an overdraft would occur, and it specifically defined "available balance" in this manner to account for holds on pending debit card transactions. Not only did no such term exist in the pre-November 2016 contract, but, as stated, there was not even any remote implication that a hold might be placed on pending debit card transactions (which might or might not go through) to reduce the balance in the account to an artificial lower one for purposes of assessing an overdraft fee. In fact, the change in the new November 2016 Account Agreement was so substantial that not only did it insert a definition and explanation of "available balance" into the body of the Account Agreement, but the November 2016 Account Agreement also added new terms to its "Glossary" to address this change in terms, including changing the definition of "Overdraft Item Fee," and adding to the Glossary for the first time new definitions for "Available Balance" and "Current Balance," definitions which did not exist in the pre-November 2016

8

Account Agreement.  That is why the class period in this case for Class 1 is cut-off on November 1, 2016.

28.    PUB's changes and additions to the terms in its November 2016 Account Agreement underscore and reinforce that prior to November 2016, the Account Agreement contract was not in any way to place a hold on pending debit card transactions for determining whether an overdraft fee could be assessed.  Rather, under the Account Agreement, at best for PUB there was an ambiguity within the Account Agreement itself whether PUB could or could not place a hold on deposits pursuant to the Funds Availability Policy in the Account Agreement contract when determining whether to assess an overdraft fee.  But nowhere is there even an ambiguity on the issue of whether it could place a hold on pending debit card transactions to determine whether an overdraft fee may be assessed; it could not. Only after the November 2016 Account Agreement went into effect was there even a mention or consideration of placing holds on pending debit card transactions and deducting those holds from the funds in the account to determine whether an overdraft fee may be assessed.

29.    In the alternative, PUB violated its own Funds Availability Policy during the class period set forth in its Account Agreement (prior to November 2016), because that section clearly identifies the situations under which funds might not be available. PUB also promises that it will not assess overdraft fees on ATM and non-recurring debit card transactions against any customer who does not "opt in" to the overdraft service.

30.    PUB's contractual promises in its Opt-In Contract and in its Account Agreement contract to only assess overdraft fees when there is not enough money in the account to cover the item, and to only assess such fees for ATM and non-recurring debit transactions against customers who had fully "opted-in" to the overdraft program, were also provided to customers in other disclosures and marketing materials.

31.    However, directly contrary to these promises, PUB's policy and practice is to ignore whether there is money in the account or a negative balance.  Instead, PUB's policy and practice is, and at all times relevant herein has been, to assess overdraft fees based on an artificial

internal calculation by which it deducts holds it has placed on either pending debit card
transactions or deposits,  rather than use the actual money in the account as required by the Opt-
In Contract, or the funds in the account as required by the Account Agreement without deduction
for pending debit card transactions to determine whether an overdraft has occurred.

      32.     The artificial balance created by PUB which it used is not the customer's actual
money in the account.   Rather, it is the balance in a customer's account *minus* anticipated future
debits (debits that may or may not occur) and *minus* deposit holds. Not only is the practice of
using this artificial balance method rather than the money in the account to determine whether a
transaction results in an overdraft and thus is subject to an overdraft fee directly contrary to
PUB's Opt-In Contract as well as to its Account Agreement, but such practices have resulted in
PUB improperly charging unlawful overdraft fees. PUB created this "artificial balance" to
increase overdraft fees it charged its customers.

      33.     PUB's practice of charging overdraft fees, even when there is enough money in
the account to cover a transaction presented for payment, is inconsistent with how PUB
expressly describes the circumstances under which overdraft fees are assessed. Further, PUB has
charged its customers, including Plaintiff and the members of the Class, overdraft fees for ATM
and/or non-recurring debit card purchases, without obtaining their appropriate consent to do so,
in violation of Regulation E, and in violation of its contractual promises that it would not charge
overdraft fees for ATM and non-recurring debit card purchases without obtaining its customers'
separate consent, because PUB's opt-in method or methods do not include providing its
customers the information required to obtain their legally binding informed consent because,
*inter alia*, the description in the Opt-In Contract did not describe what PUB was actually doing,
as required by Regulation E.

      34.     The importance of Regulation E is highlighted by the fact that the Consumer
Financial Protection Bureau's ("Bureau") study of actual practices found that: 1) ATM and debit
card transactions are by far the most frequent transactions that occur; 2) overdraft fee policies

entail expensive fees at very little risk to the financial institutions; and 3) opted-in accounts have seven times as many overdrafts that result in fees as not opted-in accounts.[2]

35.     Plaintiff and the Class members have performed all conditions, covenants, and promises required by each of them in accordance with the terms and conditions of the contracts.

36.     Meanwhile, Plaintiff and the Class members could not have anticipated the harm resulting from Defendant's practice throughout the class periods.  Money in the account, without deduction for holds on pending transactions or on deposits, as stated, is the official balance of the account.  It is the balance provided to the customer in monthly statements, which is the official record of activity in the account.  It is the balance used to determine interest on deposits and any minimum balance requirements.  Further, based on information and belief, it is the balance used by PUB to report its deposits to regulators, shareholders and the public.  It is the deposit balance provided to regulators in call reports and reserve reports.  It is the balance used in financial reports to shareholders and the balance used for internal financial reporting. It is the balance used by credit reporting agencies in providing credit ratings of PUB.

37.     When PUB refers to balance or funds or money in the account, it is reasonable to interpret and understand that as referring to the official balance in the account—which is the balance without deduction for pending debit card transactions or deduction for holds on deposits. In its study, the Bureau concluded that when a financial institution creates the "overall impression" that it would determine overdraft transactions and fees based on the balance in the account rather than an artificially created balance which has deducted pending transactions, then the "disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive."  The Bureau further found that "consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures)."  (Supervisory Highlights, Winter 2015, at p.9.)

---

[2] http://files.consumerfinance.gov/f/201407_cfpb_report_data-point_overdrafts.pdf

38.     Therefore, Plaintiff, on behalf of herself and all others similarly situated, seeks relief as set forth below.

**B.      Unlawful Overdraft Fees Assessed to Plaintiff**

39.     Plaintiff was harmed by Defendant's policy and practice of charging overdraft fees when there was money in her account to cover the transaction.  Plaintiff entered into agreements with PUB wherein PUB contracted to charge overdraft fees only if her account did not have money to cover the transaction.  By nonetheless charging Plaintiff overdraft fees when her account did contain enough money to complete the transaction, PUB breached its contracts with Plaintiff.  It will be necessary to obtain Defendant's records to determine each instance of such a wrongful overdraft fee.  However, to give one example, on May 26, 2016, Plaintiff had a positive account balance of $22.11 when she made a purchase for $4.76, leaving her a with a positive balance of $17.35.  Despite the fact that her account contained enough money to complete the transaction, Plaintiff was assessed a wrongful overdraft fee in the amount of $37.  Plaintiff has a reasonable belief that a complete review of Plaintiff's and PUB's records will show multiple instances in which PUB improperly charged Plaintiff overdraft fees for transactions despite the fact that Plaintiff had enough money in her account to cover the transactions.

40.     Moreover, the assessment and unilateral taking of improper overdraft fees further reduces the balance and amount of funds in the account, resulting in and aggressively causing subsequent, otherwise non-overdraft transactions to be improperly treated as transactions for which PUB assesses further overdraft fees.  This practice was deemed to be deceptive and substantially harmful to customers by the Consumer Finance Protection Bureau, which made the following conclusions in its studies:

> Examiners also observed at one or more institutions the following sequence of events after the institutions switched balance-calculation methods: a financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of

authorization; settlement of a subsequent unrelated transaction that further
lowered the customer's available balance and pushed the account into
overdraft status; and when the original electronic transaction was later
presented for settlement, because of the intervening transaction and
overdraft fee, the electronic transaction also posted as an overdraft and an
additional overdraft fee was charged. Because such fees caused harm to
consumers, one or more supervised entities were found to have acted
unfairly when they charged fees in the manner described above. Consumers
likely had no reason to anticipate this practice, which was not appropriately
disclosed. They therefore could not reasonably avoid incurring the overdraft
fees charged. Consistent with the deception findings summarized above,
examiners found that the failure to properly disclose the practice of charging
overdraft fees in these circumstances was deceptive.

(*Infra,* Supervisory Highlights, Winter 2015, a pp. 8-9.)   A complete evaluation of PUB's
records is necessary to determine the full extent of Plaintiff's harm from this practice.

41.     Additionally, because the Opt-In Contract did not describe PUB's actual overdraft
service, and/or because it contained other deficiencies, PUB violated Regulation E by charging
overdraft fees on ATM and non-recurring debit card transactions.  Because it failed to provide
the full and accurate disclosures to Plaintiff required by Regulation E, PUB failed to obtain
Plaintiff's fully informed consent as required by Regulation E in order for PUB to be authorized
to charge such overdraft fees.  Because PUB was not legally authorized to enroll Plaintiff into
the program for non-recurring debit card and ATM transactions, PUB violated Regulation E
when it assessed any overdraft fees against Plaintiff for non-recurring debit card and ATM
transactions.

42.     Plaintiff was harmed by this practice when she was assessed overdraft fees for
nonrecurring debit card and ATM transactions, such as occurred on May 27, 2016.  A complete

13

evaluation of PUB's records is necessary to determine the full extent of Plaintiff's harm from this practice as well.

**CLASS ACTION ALLEGATIONS**

43.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

44.    Plaintiff brings this case, and each of her respective causes of action, as a class action pursuant to Federal Rule of Civil Procedure 23(a)(b)(1), (b)(2) and (b)(3) on behalf of the following class.

45.    The "Class" is composed of two classes:

**The Account Balance Class:**

> **All United States residents who have or have had accounts with PUB who incurred an overdraft fee or overdraft fees when the balance in the checking account was sufficient to cover the transaction or transactions at issue during the period beginning six years preceding the filing of this Complaint and ending on November 1, 2016.**

**The Regulation E Class:**

> **All United States residents who have or have had accounts with PUB who incurred an overdraft fee or overdraft fees for ATM or non-recurring debit card transaction(s) during the period beginning on August 15, 2010 and through the present.**

46.    Excluded from the Class is: (1) any entity in which Defendant has a controlling interest; (2) officers or directors of Defendant; (3) this Court and any of its employees assigned to work on the case; and (4) all employees of the law firms representing Plaintiff and the Class members.

47.    This action has been brought and may be properly maintained on behalf of each member of the Class under Federal Rule of Civil Procedure 23.

48.     **Numerosity of the Class (Federal Rule of Civil Procedure 23(a)(1))** – The
members of the Class are so numerous that a joinder of all members would be impracticable.
While the exact number of Class members is presently unknown to Plaintiff, and can only be
determined through appropriate discovery, Plaintiff believes that the Class is likely to include
thousands of members based on the fact that PUB has approximately $39.18 billion in assets and
operates 10 branches in Connecticut.

49.     Upon information and belief, Defendants have databases, and/or other
documentation, of its customers' transactions and account enrollment.  These databases and/or
documents can be analyzed by an expert to determine which of PUB's customers have been
harmed by its practices and thus qualify as Class members.  Further, the Class definitions
identify groups of unnamed plaintiffs by describing a set of common characteristics sufficient to
allow a member of that group to identify himself or herself as having a right to recover.  Other
than by direct notice by mail or email, alternatively proper and sufficient notice of this action
may be provided to the Class members through notice published in newspapers or other
publications, or in other manners.

50.     **Commonality (Federal Rule of Civil Procedure 23(a)(2)** – This action involves
common questions of law and fact.  The questions of law and fact common to both Plaintiff and
the Class members include, but are not limited to, the following:

a.     Whether, pursuant to the Opt-In Contract, Defendant promised to
Plaintiff and the Class members that it would not charge an overdraft fee if there
was enough money in the account to cover the transaction;

b.     Whether, pursuant to the Account Agreement contract, Defendant
promised to Plaintiff and the Class members that it would not charge an overdraft
fee if there was enough money in the account to cover the transaction;

c.     Whether Defendant breached the Opt-In Contract or Account
Agreement Contract by assessing overdraft fees for transactions when customers'
checking accounts contained enough money to cover the transactions;

15

       d.      Whether the language in the Opt-In Contract accurately described Defendant's overdraft service pursuant to which Defendant assessed overdraft fees;

       e.      Whether Defendant is liable under claims of breach of the covenant of good faith and fair dealing, unjust enrichment and money had and received;

       f.      Whether Defendant's conduct violated state consumer protection laws; and

       g.      Whether Defendant's conduct violated 12 C.F.R. § 1005.17.

51.    **Typicality (Federal Rule of Civil Procedure 23(a)(3))** – Plaintiff's claims are typical of all of the members of the Class.  The evidence and the legal theories regarding Defendant's alleged wrongful conduct committed against Plaintiff and all of the Class members are substantially the same because all of the relevant agreements between Defendant and its customers, including the Opt-In Contract and Customer Account contract, were identical as to all relevant terms, and also because the challenged practices of charging customers for overdraft fees when there were sufficient funds in the accounts to pay for the transactions at issue, are uniform for Plaintiff and all Class members.  Accordingly, in pursuing her own self-interest in litigating her claims, Plaintiff will also serve the interests of the other Class members.

52.    **Adequacy (Federal Rule of Civil Procedure 23(a)(4))** – Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff has retained competent counsel experienced in class action litigation and overdraft fee issues to ensure such protection.  There are no material conflicts between the claims of the representative Plaintiff and the members of the Class that would make class certification inappropriate.  Plaintiff and her counsel intend to prosecute this action vigorously.

53.    **Predominance and Superiority (Federal Rule of Civil Procedure 23(b)(3))** – The matter is properly maintained as a class action under Rule 23(b)(3) because the common questions of law or fact identified herein and to be identified through discovery predominate over

questions that may affect only individual Class members. Further, the class action is superior to all other available methods for the fair and efficient adjudication of this matter. Because the injuries suffered by the individual Class members are relatively small, the expense and burden of individual litigation would make it virtually impossible for Plaintiff and Class members to individually seek redress for Defendant's wrongful conduct. Even if any individual person or group(s) of Class members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court. In contrast, the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of fact and law. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, Plaintiff and the Class members will continue to suffer losses, thereby allowing Defendant's violations of law to proceed without remedy and allowing Defendant to retain the proceeds of their ill-gotten gains.

54.     Plaintiff is not aware of any separate litigation instituted by any of the class members against Defendant. Plaintiff does not believe that any other Class members' interest in individually controlling a separate action is significant, in that Plaintiff has demonstrated above that her claims are typical of the other Class members and that she will adequately represent the Class. This particular forum is a desirable forum for this litigation because both Plaintiff and Defendant reside in this District, where Defendant operates branch offices, and where its actual business headquarters are located. Plaintiff does not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

55.     Plaintiff anticipates the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class members. Upon information and belief, Defendant's own business records and/or electronic media can be utilized for the contemplated notices. To the extent that any further notices may be required, Plaintiff anticipates the use of additional media and/or mailings.

56.     This matter is properly maintained as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure, in that:

    a.   Without class certification and determination of declaratory, injunctive, statutory and other legal questions within the Class format, prosecution of separate actions by individual members of the Class will create the risk of:

        1.   Inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or

        2.   Adjudication with respect to individual members of the Class, which would as a practical matter be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests. The parties opposing the Class have acted or refused to act on grounds generally applicable to each member of the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

    b.   Common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual members, and a class action is superior to other available methods of the fair and efficient adjudication of the controversy, including consideration of:

        1.   The interests of the members of the Class in individually controlling the prosecution or defense of separate actions;

2. The extent and nature of any litigation concerning controversy already commenced by or against members of the Class;

3. The desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

4. The difficulties likely to be encountered in the management of a class action.

## FIRST CAUSE OF ACTION

### (Breach of The Opt-In Contract)

57. The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

58. Plaintiff and each of the Class members entered into the Opt-In Contract with Defendant covering the subject of overdraft transactions. This contract was drafted by and binding upon Defendant.

59. In the Opt-In Contract, Defendant promised that PUB would assess overdraft fees only when there was not enough money in the account to cover the transaction.

60. Plaintiff and the Class members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the Opt-In Contract, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

61. Defendant breached the express terms of the Opt-In Contract by, *inter alia*, assessing overdraft fees when there was money in the account to cover the transaction or transactions at issue.

62. As a proximate result of Defendant's breach of the Opt-In Contract, Plaintiff and the Class members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## SECOND CAUSE OF ACTION

### (Breach of the Account Agreement Contract)

63.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

64.     Plaintiff and each of the Class members entered into the Account Agreement contract with Defendant covering the subject of overdraft transactions. This contract was drafted by and binding upon Defendant.

65.     In the Account Agreement Contract, Defendant promised that PUB would assess overdraft fees when there were "insufficient funds" in the account to cover the transaction. Nowhere did the Account Agreement contract state it would deduct pending debit card transactions for purposes of determining "sufficient funds" when assessing an overdraft fee.

66.     Plaintiff and the Class members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the Account Agreement contract, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

67.     Defendant breached the express terms of the Account Agreement contract by, *inter alia*, assessing overdraft fees when there were sufficient funds in the account to cover the transaction or transactions at issue.

68.     As a proximate result of Defendant's breach of the Account Agreement contract, Plaintiff and the Class members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## THIRD CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

69.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

70.     Plaintiff and each of the Class members entered into contracts with Defendant covering the subject of overdraft transactions, which have been identified herein as the Opt-In

20

Contract and Account Agreement contract. These contracts were drafted by and are binding upon Defendant.

71.     In the contracts, Defendant promised that PUB would assess overdraft fees only when there was not enough money in the account to cover the transaction.

72.     Further, good faith is an element of every contract pertaining to the assessment of overdraft fees. Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Thus, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms, constitute examples of bad faith in the performance of contracts.

73.     The material terms of the contract also included the implied covenant of good faith and fair dealing, whereby Defendant covenanted that it would, in good faith and in the exercise of fair dealing, deal with Plaintiff and each Class member fairly and honestly and do nothing to impair, interfere with, hinder, or potentially injure Plaintiff's and the Class members' rights and benefits under the contract.

74.     Plaintiff and the Class members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the contract, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

75.     Defendant breached the implied covenant of good faith and fair dealing based on its practices of assessing fees when there was enough money in the account to cover the transaction, failing to provide an accurate description of its overdraft program in its Account Agreement contract, and failing to provide an accurate description of its overdraft program for non-recurring debit and ATM transactions in its Opt-In Contract. In so doing, and in implementing its overdraft program for the purpose of increasing and maximizing overdraft fees,

Defendant executed a contractual obligation in bad faith, depriving Plaintiff and the Class
members of the full benefit of the contract.

76.     As a proximate result of Defendant's breach of the implied covenant of good faith
and fair dealing, Plaintiff and the Class members have been damaged in an amount to be proven
at trial and seek relief as set forth in the Prayer below.

### THIRD CAUSE OF ACTION

#### (Unjust Enrichment/Restitution)

77.     The preceding allegations are incorporated by reference and re-alleged as if fully
set forth herein.

78.     As a result of the wrongful misconduct alleged above, Defendant unjustly
received millions of dollars in overdraft fees.

79.     The Consumer Finance Protection Bureau has concluded that inadequate
disclosure of the type of balance-calculation used to determine overdraft transactions and their
resultant fees that create additional overdraft fee harm constitutes an Unfair, Deceptive, or
Abusive Acts or Practices.  (CFPB Bulletin 2013-07[3], at p. 2 (defining Unfair, Deceptive, or
Abusive Acts or Practices based on the FTC balancing test: "1) It causes or is likely to cause
substantial injury to consumers; 2) The injury is not reasonably avoidable by consumers; and 3)
The injury is not outweighed by countervailing benefits to consumers or to competition"); CFPB
Supervisory Highlights, Winter 2015, at p. 9 ("Furthermore, because consumers were
substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall
net impression created by the disclosures (in a manner not outweighed by countervailing benefits
to consumers or competition), and because consumers could not reasonably avoid the fees (given
the misimpressions created by the disclosures), the practice of assessing the fees under these
circumstances was found to be unfair.").)

---

[3] http://files.consumerfinance.gov/f/201307_cfpb_bulletin_unfair-deceptive-abusive-
practices.pdf

80.     Because Plaintiff and the Class members paid the erroneous overdraft fees assessed by Defendant, Plaintiff and the Class members have conferred a benefit on Defendant, albeit undeservingly.  Defendant has knowledge of this benefit, as well as the wrongful circumstances under which it was conveyed, and yet has voluntarily accepted and retained the benefit conferred.  Should it be allowed to retain such funds, Defendant would be unjustly enriched.  Therefore, Plaintiff and the Class members seek relief as set forth in the Prayer below.

### FOURTH CAUSE OF ACTION

### (Money Had and Received)

81.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

82.     Defendant has obtained money from Plaintiff and the Class members by the exercise of undue influence, menace or threat, compulsion or duress, and/or mistake of law and/or fact.

83.     As a result, Defendant has in its possession money which, in equity, belongs to Plaintiff and the Class members, and thus, this money should be refunded to Plaintiff and the Class members.  Therefore, Plaintiff and the Class members seek relief as set forth in the Prayer below.

### FIFTH CAUSE OF ACTION

### (Violation of Electronic Fund Transfers Act (Regulation E)

### C.F.R. § 1005 et seq.  (authority derived from 15 U.S.C. § 1693 et seq.))

84.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

85.     By charging overdraft fees on ATM and nonrecurring transactions, PUB violated Regulation E (12 C.F.R. §§1005 *et seq.*), whose "primary objective" is "the protection of consumers" (§1005.1(b)) and which "carries out the purposes of the [Electronic Fund Transfer Act (15 U.S.C. §§1693 *et seq.*), the "EFTA"] (§1005.1(b)), whose express "primary objective" is also "the provision of individual consumer rights" (15 U.S.C. §1693(b)).

23

86.   Specifically, the charges violated what is known as the "Opt In Rule" of Reg E. (12 C.F.R. §1005.17.) The Opt In Rule states:  "a financial institution ... *shall not assess a fee or charge* ... pursuant to the institution's overdraft service, *unless* the institution:  (i) [p]rovides the consumer with a notice in writing [the opt-in notice]... *describing the institution's overdraft service*"  and (ii) "[p]rovides a reasonable opportunity for the consumer to *affirmatively consent*" to enter into the overdraft program (*Id.*)  The notice "shall be clear and readily understandable." (12 C.F.R. §205.4(a)(1).)  To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide its customers a reasonable opportunity to opt-in after receiving the description.  The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.

87.   The intent and purpose of this Opt-In Contract is to "assist customers in understanding how overdraft services provided by their institutions operate .... by explaining the institution's overdraft service ... in a clear and readily understandable way"—as stated in the Official Staff Commentary (74 Fed. Reg. 59033, 59035, 59037, 5940, 5948), which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Reg E. *Strubel v. Capital One Bank (USA)*, 2016 U.S. Dist. LEXIS 41487, *11 (S.D. N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Reg Z)).

88.   PUB failed to comply with Regulation E, 12 C.F.R. § 1005.17, which requires affirmative consent before a financial institution is permitted to assess overdraft fees against customers' accounts through an overdraft program for ATM and non-recurring debit card transactions.  PUB has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its customers with a valid description of the overdraft program which

24

meets the strictures of 12 C.F.R. § 1005.17. PUB's opt-in method fails to satisfy 12 C.F.R. §1005.17 because, *inter alia*, it states that an overdraft occurs when there is not enough money in the account to cover a transaction but PUB pays it anyway, when in fact PUB assesses overdraft fees when there is enough money in the account to pay for the transaction at issue.

89.     As a result of violating Regulation E's prohibition against assessing overdraft fees on ATM and non-recurring debit card transactions without obtaining affirmative consent to do so PUB has harmed Plaintiff and the Class.

90.     Due to PUB's violation of Regulation E (12 C.F.R. § 1005.17), Plaintiff and members of the Class are entitled to actual and statutory damages, as well as attorneys' fees and costs of suit pursuant to 15 U.S.C.A. § 1693m.

## SIXTH CAUSE OF ACTION

### (For Violation of the Connecticut Unfair Trade Practices Act, Connecticut Code § 42-110(a), et seq.)

91.     The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

92.     By the actions alleged above, Defendant has engaged in unfair and/or deceptive acts or practices against Plaintiff and the Class members in violation of the Connecticut Unfair Trade Practices Act. The practices were deceptive because, *inter alia*, Defendant promised Plaintiff and the Class members in its contracts and in other representations, including marketing materials, that it would only assess fees for overdrafts where the transaction at issue exceeded the amount of money in the customer's account. Those promises were intended to induce Plaintiff to engage in an obligation, signing up for an account with Defendant, and/or entry into Defendant's overdraft program, and they were untrue. Instead, Defendant assessed fees based on a limited portion of the customer's account because it would create an artificial balance by deducting holds it had placed on the money in account for pending transactions or for deposits, despite there at all times being enough money actually in the account to cover the transaction.

Defendant also engaged in an unfair and/or deceptive act or practice when it charged overdraft fees for ATM and non-recurring debit card transactions despite its contractual and legal obligations not to do so when there was enough money in the account to cover the transaction. Plaintiffs suffered when they were assessed wrongful overdraft fees.

93.    Plaintiff and the Class suffered ascertainable harm, and are thus entitled to damages and other relief in a form and amount to be determined by a court of law.

## PRAYER

WHEREFORE, Plaintiff and the Class pray for judgment as follows:

1. For an order certifying this action as a class action;

2. For compensatory damages on all applicable claims and in an amount to be proven at trial;

3. For an order requiring Defendant to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

4. For an order enjoining the wrongful conduct alleged herein;

5. For costs;

6. For pre-judgment and post-judgment interest as provided by law;

7. For attorneys' fees under the Electronic Fund Transfer Act, the common fund doctrine, and all other applicable law; and

8. For such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff and the Class members demand a trial by jury on all issues so triable.

TERRIANN WALKER, individually, and on behalf of others
similarly situated,

BY: _____
       Richard E. Hayber
       Bar No.: CT11629
       Hayber Law Firm, LLC
       221 Main Street, Suite 502
       Hartford, CT  06106
       Telephone:  (860) 522-8888
       Facscimile: (860) 218-9555
       rhayber@hayberlawfirm.com

       Richard D. McCune, California Bar No. 132124*
       rdm@mccunewright.com
       Jae (Eddie) K. Kim, California Bar No. 236805*
       jkk@mccunewright.com
       **McCUNE WRIGHT AREVALO LLP**
       3281 East Guasti Road, Suite 100
       Ontario, California 91761
       Telephone:  (909) 557-1250
       Facsimile:  (909) 557-1275

       Taras Kick, California Bar No. 143379*
       Taras@kicklawfirm.com
       Robert Dart, California Bar No. 264060*
       Robert@kicklawfirm.com
       **THE KICK LAW FIRM, APC**
       201 Wilshire Boulevard
       Santa Monica, California 90401
       Telephone:   (310) 395-2988
       Facsimile:   (310) 395-2088

       Attorneys for Plaintiff Terriann Walker
       and the Putative Class

       *Pro Hac Vice* Petitions to be submitted

27